14-543-cv
Davis v. Shah

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————————

August Term, 2014

(Argued: January 5, 2015    Decided: March 24, 2016)

Docket No. 14-543-cv

———————————

HARRY DAVIS, RITA-MARIE GEARY, PATTY POOLE, ROBERTA WALLACH,
on behalf of themselves and others similarly situated,

*Plaintiffs-Appellees*,

— v. —

NIRAV SHAH, individually and in his official capacity
as Commissioner of the New York State Department of Health,

*Defendant-Appellant*.

———————————

B e f o r e:

LYNCH and CHIN, *Circuit Judges*, and KORMAN, *District Judge*.[*]

———————————

———————————

[*] The Honorable Edward R. Korman, of the United States District Court for the
Eastern District of New York, sitting by designation.

Plaintiffs-appellees brought this class action against defendant-appellant Nirav Shah, Commissioner of the New York State Department of Health, challenging New York's restrictions on coverage of certain medical services under its Medicaid plan. Plaintiffs argued that New York's 2011 plan amendments limiting coverage of orthopedic footwear and compression stockings to certain enumerated medical conditions violate the Medicaid Act's reasonable standards, home health services, due process, and comparability provisions, as well as the anti-discrimination provision and integration mandate of the Americans with Disabilities Act and Rehabilitation Act. The district court granted summary judgment to defendants on plaintiffs' home health services claim and the hearing aspect of plaintiffs' due process claim, and granted summary judgment to plaintiffs on all their remaining claims. It subsequently entered a permanent injunction barring New York from enforcing the coverage restrictions.

We affirm in part and vacate in part. Because neither the Medicaid Act nor the Supremacy Clause confers a private cause of action to enforce the reasonable standards provision, we vacate the grant of summary judgment to plaintiffs on their reasonable standards claim. We decline to reach plaintiffs' integration mandate claim as largely duplicative of their anti-discrimination claim under the Americans with Disabilities Act and Rehabilitation Act. With respect to plaintiffs' other claims, however, we affirm the district court's summary judgment rulings. Nevertheless, because the injunction ordered by the district court is broader than is warranted by our liability determinations, we vacate that injunction and remand for reconsideration of the appropriate relief.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

————————

VICTOR PALADINO, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Andrea Oser, Deputy Solicitor General, *on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, Albany, New York, for *Defendant-Appellant*.

2

GEOFFREY A. HALE (Bryan D. Hetherington and Jonathan Feldman, Empire Justice Center, and Martha Jane Perkins, National Health Law Program, *on the brief*), Empire Justice Center, Rochester, New York, for *Plaintiffs-Appellees*.

Molly J. Moran, Acting Assistant Attorney General (Mark L. Gross and Robert A. Koch, Attorneys, *on the brief*), Department of Justice, Civil Rights Division, Washington, D.C., *for Amicus Curiae United States Department of Justice in Support of Plaintiffs-Appellees*.

Benjamin C. Mizer, Principal Deputy Assistant Attorney General (Alisa B. Klein and Lindsey Powell, Attorneys, *on the brief*), Department of Justice, Civil Division, Washington, D.C., *for Amicus Curiae United States Department of Health and Human Services, Centers for Medicare and Medicaid Services, in Support of Neither Party*.

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs-appellees Harry Davis, Rita-Marie Geary, Patty Poole, and Roberta Wallach ("plaintiffs") brought this class action against defendant-appellant Nirav Shah, Commissioner of the New York State Department of Health (the "Commissioner"), challenging New York's coverage restrictions on certain medical services provided under its Medicaid plan. Plaintiffs argue that New York's 2011 plan amendments, which restrict coverage of orthopedic

3

footwear and compression stockings to patients with certain enumerated medical conditions, violate the Medicaid Act's reasonable standards, home health services, due process, and comparability provisions, as well as the anti-discrimination provision and integration mandate of Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act. The United States District Court for the Western District of New York (Charles J. Siragusa, *Judge*) granted summary judgment to defendant on plaintiffs' home health services claim and the hearing aspect of their due process claim, and granted summary judgment to plaintiffs on all their remaining claims. The court subsequently entered a permanent injunction barring New York from enforcing its coverage restrictions against any beneficiaries under its plan.

We affirm in part and vacate in part. Because neither the Medicaid Act nor the Supremacy Clause confers a private cause of action to enforce the reasonable standards provision, we vacate the district court's grant of summary judgment to plaintiffs on that claim. We also decline to reach plaintiffs' unequal treatment claim under the ADA and Rehabilitation Act as largely duplicative of their integration mandate claim. With respect to the remaining claims, however, we affirm the summary judgment rulings of the district court. Because orthopedic

4

footwear and compression stockings constitute optional "prosthetics" rather than mandatory "home health services" under the Medicaid Act, defendant is entitled to summary judgment on plaintiffs' home health services claim. Because the due process provision required New York to provide plaintiffs with written notice – though not evidentiary hearings – prior to terminating their benefits, defendant is entitled to summary judgment on the hearing element and plaintiffs are entitled to summary judgment on the notice element of plaintiffs' due process claim. Because New York's coverage restrictions deny some categorically needy individuals access to the same scope of medically necessary services made available to others, plaintiffs are entitled to summary judgment on their comparability provision claim. Because New York's restrictions violate the integration mandate of the ADA and Rehabilitation Act, plaintiffs are entitled to summary judgment on their anti-discrimination claims under those statutes.

Finally, because the injunction granted by the district court is broader than is warranted by our liability conclusions, we vacate that injunction and remand for further consideration of the appropriate relief.

## BACKGROUND

I.     The Federal Medicaid Program

Enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, the Medicaid Act is a cooperative federal-state program designed to provide medical assistance to persons whose resources are insufficient to meet the costs of their necessary medical care. Himes v. Shalala, 999 F.2d 684, 686 (2d Cir. 1993). On the federal level, the program is administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS"). Although no state is required to participate in Medicaid, states that choose to do so must formulate a plan of administration that complies with both the Medicaid Act and regulations promulgated by HHS. 42 U.S.C. § 1396a; Lewis v. Thompson, 252 F.3d 567, 569 (2d Cir. 2001). Once CMS approves the state plan as complying with all statutory and regulatory requirements, the federal government will subsidize a significant portion of the state's expenditures in administering the program. 42 U.S.C. §§ 1396a(b), 1396b; Rodriguez v. City of New York, 197 F.3d 611, 613 (2d Cir. 1999).

A state's Medicaid plan defines both the categories of individuals eligible for benefits and the categories of services that are covered for those different groups. See 42 U.S.C. § 1396a(a); Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 650 (2003). With regard to beneficiaries, the Medicaid Act requires any state participating in Medicaid to provide medical assistance to the "categorically needy." Roach v. Morse, 440 F.3d 53, 59 (2d Cir. 2006). That group includes aged, blind, or disabled individuals who qualify for supplemental security income; individuals eligible for the Aid to Families with Dependent Children program; and other low-income groups, such as pregnant women and children, entitled to poverty-related benefits. See 42 U.S.C. § 1396a(a)(10)(A)(i); Walsh, 538 U.S. at 651 n.4. A state may also, at its option, provide medical assistance to the "medically needy." Roach, 440 F.3d at 59. That group includes individuals whose income or resources exceed the financial threshold for categorical coverage, but who otherwise meet the eligibility requirements that define the categorically needy. See 42 U.S.C. § 1396a(a)(10)(C); 42 C.F.R. § 435.301; Walsh, 538 U.S. at 651 n.5. Unlike the categorically needy, who can cover the costs of neither their basic needs nor necessary medical care, the "medically needy" have

7

sufficient resources to cover their basic needs but not their necessary medical care. Roach, 440 F.3d at 59.

With regard to services provided under a state plan, the Medicaid Act similarly specifies certain categories of mandatory and optional medical care. 42 U.S.C. § 1396a(a)(10)(A); id. § 1396d(a); Rodriguez, 197 F.3d at 613. A state is required to provide some benefits to all categorically needy individuals, including, among others, nursing facility services for persons over 21 and "home health care services." 42 U.S.C. § 1396a(a)(10)(A); id. §§ 1396d(a)(4), (7). While a state need not provide either service to the medically needy, any state that elects to provide nursing facilities services to those beneficiaries must also provide home health services. Id. § 1396a(a)(10)(D); 42 C.F.R. § 440.220(a)(3). Furthermore, the Medicaid Act identifies a number of purely optional services that a state may provide to either the categorically needy or to both the categorically and medically needy. Optional services include, among other things, "prosthetic devices." 42 U.S.C. § 1396a(a)(10)(A); id. § 1396d(a)(12); see also 42 C.F.R. 440.120(c); id. § 440.225.

The Medicaid Act imposes several requirements on the administration of both required and optional services under a state plan. Under the so-called

8

"reasonable standards" provision, the Act provides that a participating state must "include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives" of the Medicaid program. 42 U.S.C. § 1396a(a)(17). Under the so-called "comparability" provision, the Act requires that the medical assistance available to any categorically needy individual "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual," nor "less in amount, duration, or scope than the medical assistance made available to [non-categorically needy] individuals." 42 U.S.C. § 1396a(a)(10)(B); see also 42 C.F.R. § 440.240; Rodriguez, 197 F.3d at 615. Finally, under the due process provision, a state plan participating in Medicaid must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied." 42 U.S.C. § 1396a(a)(3). That requirement entails both written notice of any intended actions affecting a beneficiary's claim and an evidentiary hearing to contest denials of service. See 42 C.F.R. §§ 431.206(b), (c); id. § 431.210.

## II. New York's 2011 Medicaid Amendments

The State of New York has participated in the federal Medicaid program since 1966. See N.Y. Soc. Serv. Law § 363; DeJesus v. Perales, 770 F.2d 316, 319 (2d Cir. 1985). The terms of New York's Medicaid plan, which is administered by the New York State Department of Health ("NYSDH"), are set out in the New York Social Services Law, see N.Y. Soc. Serv. Law § 363 *et seq.*, and Title 18 of the New York Codes, Rules and Regulations, see 18 N.Y.C.R.R. § 500 *et seq*.

New York has chosen to provide Medicaid coverage to both the categorically needy and the medically needy. See N.Y. Soc. Serv. Law § 366; Lewis, 252 F.3d at 570. Standard coverage for both types of beneficiaries under its plan is defined as the provision of

> medically necessary medical, dental and remedial care, services, and supplies . . . which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with such person's capacity for normal activity, or threaten some significant handicap . . . .

N.Y. Soc. Serv. Law § 365-a(2). Such standard medical assistance includes both nursing facility services and "home health services provided in a recipient's home." Id. §§ 365-a(2)(b), (d). It also includes coverage of "sickroom supplies,

eyeglasses, prosthetic appliances and dental prosthetic appliances." Id. § 365-a(2)(g).

Until 2011, New York's Medicaid program provided orthopedic footwear and compression stockings to all beneficiaries for whom such services were medically necessary. During that time, regulations promulgated by the NYSDH defined "orthopedic footwear" as

> shoes, shoe modifications, or shoe additions which are used to correct, accommodate or prevent a physical deformity or range of motion malfunction in a diseased or injured part of the ankle or foot; to support a weak or deformed structure of the ankle or foot, or to form an integral part of a brace.

18 N.Y.C.R.R. § 505.5(a)(4) (effective until Apr. 6, 2011). Although the regulations did not define "compression stockings," the acting director of operations at NYSDH's Office of Health Insurance Programs has described such items as hosiery that exerts pressure against the legs so as to "comfort aching and tired legs," "prevent varicose veins from stretching and hurting," "improve blood and lymph circulation," and minimize swelling.[2] Joint App'x at 353.

_____

[2] As used throughout this lawsuit, the term "compression stockings" has encompassed two separate items: "compression stockings," which have a high compression gradient and require custom fitting, and "surgical stockings," which have a lower compression gradient and may be sold over the counter. Because

11

In 2011, New York found itself facing a state-wide fiscal crisis. In searching for ways to reduce its budget, New York discovered that orthopedic footwear and compression stocking were a source of significant waste in its Medicaid program. In the fiscal year for 2010-2011, nearly half of state Medicaid payments for orthopedic footwear went to the treatment of hammertoes and bunions, common medical conditions that can readily be treated through inexpensive off-the-shelf products. Similarly, numerous beneficiaries submitting claims for compression stockings had used such items to treat common and relatively mild complaints, such as varicose veins or aching legs.

To reduce spending, New York amended its Medicaid plan to limit coverage for both orthopedic footwear and compression stockings to what it deemed to be the most frequently occurring serious conditions requiring their use. In the spring of 2011, the New York legislature added a set of qualifications to N.Y. Soc. Serv. Law § 365-a(2)(g), which addresses New York's provision of "sickroom supplies, eyeglasses, prosthetic appliances and dental prosthetic appliances." The revised version of that provision now provided that

the differences between these two items are not material to the case, we adopt the parties' usage and use the single phrase to refer to both.

12

(iii) prescription footwear and inserts are limited to coverage only when used as an integral part of a lower limb orthotic appliance, as part of a diabetic treatment plan, or to address growth and development problems in children; [and]

(iv) compression and support stockings are limited to coverage only for pregnancy or treatment of venous stasis ulcers . . . .

N.Y. Soc. Serv. Law §§ 365-a(2)(g)(iii), (iv) (effective Apr. 1, 2011).

To reflect the legislature's changes, NYSDH also amended the definitions section at 18 N.Y.C.R.R. § 505.5(a) and added a new limiting provision at § 505.5(g). The regulatory definition of "orthopedic footwear" now described such items as

shoes, shoe modifications, or shoe additions which are used . . . *in the treatment of children*, to correct, accommodate or prevent a physical deformity or range of motion malfunction in a diseased or injured part of the ankle or foot; *in the treatment of children*, to support a weak or deformed structure of the ankle or foot; as a component of a comprehensive *diabetic treatment plan* to treat amputation, ulceration, pre-ulcerative calluses, peripheral neuropathy with evidence of callus formation, a foot deformity or poor circulation; or to form an integral part of an *orthotic brace*.

18 N.Y.C.R.R. § 505.5(a)(4) (effective Apr. 6, 2011) (emphases added). The new subsection at § 505.5(g) listed several "established defined benefit limits" on

13

Medicaid services, including limitations on orthopedic footwear and

compression stockings that tracked the language of the legislature's new

qualifications at § 365-a(2)(g).  See id. §§ 505.5(g)(1), (2).[3]  The limitations

provision warned that NYSDH "shall not allow exceptions to defined benefit

limitations."  Id. § 505.5(g).

Prior to implementing its changes, NYSDH submitted a proposed plan

amendment for review by CMS, noting the new restrictions on New York's

coverage of orthopedic footwear and compression stockings.  CMS informally

---

[3] The regulatory limitation, which largely echoes the amended definition of "orthopedic footwear" in § 505.5(a)(4), reads:

> (1) Compression and surgical stockings are limited to coverage during pregnancy and for venous stasis ulcers.
> (2) Orthopedic footwear is limited to coverage in the treatment of children to correct, accommodate or prevent a physical deformity or range of motion malfunction in a diseased or injured part of the ankle or foot; in the treatment of children to support a weak or deformed structure of the ankle or foot; as a component of a comprehensive diabetic treatment plan to treat amputation, ulceration, pre-ulcerative calluses, peripheral neuropathy with evidence of callus formation, a foot deformity or poor circulation; or to form an integral part of an orthotic brace.

Id. §§ 505.5(g)(1), (2).

14

advised the department that it need not obtain CMS's approval for the new coverage restrictions because, as paraphrased by NYSDH, "such changes in medical necessity criteria were within the State's purview." Joint App'x at 360. The record contains no written statement from CMS embodying this advice. The advice is evidenced only by an affidavit from Jonathan Bick, the acting director of operations at New York's Office of Health Insurance Programs, attesting to what he was told by CMS.

NYSDH subsequently adopted its new regulations on an emergency basis effective April 6, 2011, and as a permanent rule effective March 28, 2012. It communicated the new changes in service to medical suppliers by issuing a series of "Provider Update[s] for Pharmacy and DME Providers." JA162. It did not notify individual beneficiaries of the changes.

By restricting coverage for orthopedic footwear and compression stockings, New York saved $14.6 million during the 2011-2012 fiscal year.

III.    The Plaintiffs

Plaintiffs include both categorically needy and medically needy individuals who qualify for New York's Medicaid plan on the basis of their disabilities. They suffer from a variety of ailments, including multiple sclerosis,

15

paraplegia, lymphedema, cellulitis, psoriatic arthritis, peripheral neuropathy, and trans-metatarsal amputation. Plaintiffs' doctors have prescribed them orthopedic footwear or compression stockings as medically necessary items to treat their afflictions. Such products help plaintiffs to maintain mobility and to avoid more serious complications, including skin ruptures, infections, and further amputations, which may require extended hospital care or even institutionalization. The Commissioner does not dispute that orthopedic footwear or compression stockings are in fact medically necessary to treat plaintiffs' conditions.

Prior to New York's 2011 amendments, most plaintiffs had received Medicaid coverage for their orthopedic footwear or compression stockings.[6] Because none of plaintiffs' diagnoses fall within New York's 2011 list of qualifying conditions, however, plaintiffs lost funding for those services in April 2011. They received no written notice of the new coverage restrictions, but instead learned of New York's change in service when they attempted to fill or refill their orders and were denied by their medical providers.

---

[6] One plaintiff, Patty Poole, was first prescribed compression stockings in the spring of 2011, after New York's coverage restrictions took effect.

IV.    Procedural History

On March 14, 2012, plaintiffs commenced this suit as a putative class action against the Commissioner in the United States District Court for the Western District of New York.  They claimed that New York's coverage restrictions violated the Medicaid Act's reasonable standards provision, 42 U.S.C. § 1396a(a)(17), its home health services provision, id. § 1396a(a)(10)(D), its due process provision, id. § 1396a(a)(3), and its comparability provision, id. § 1396a(a)(10)(B).  They also claimed that the amendments discriminated against them on the basis of disability and put them at risk of institutionalization in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794.  Plaintiffs sought declaratory and injunctive relief prohibiting NYSDH from implementing the service changes, as well as attorneys' fees and costs and disbursements.

In October 2012, plaintiffs moved for summary judgment on all counts of the complaint, and the Commissioner cross-moved for summary judgment on all counts.  Prior to considering those motions, the district court granted plaintiffs' motion for class certification.  Echoing the broad certification request in plaintiffs' complaint, the court certified a class that encompassed

> [a]ll current and future New York State Medicaid recipients for whom Defendant has directly or indirectly failed to provide coverage for medically necessary orthopedic footwear and compression stockings as a result of New York Soc. Serv. Law § 365-a(2)(g)(iii) and (iv) and regulations and policies promulgated thereto.

Joint App'x at 415.[7]

On December 9, 2013, the district court issued an order granting in part and denying in part both parties' motions for summary judgment. The district court granted judgment to defendant on plaintiffs' home health services claim, holding that orthopedic footwear and compression stockings qualified as "prosthetics" rather than "home health services," and consequently were optional services that failed to trigger that provision. With regard to the remaining claims, however, the district court ruled largely in favor of plaintiffs. Judge Siragusa found that New York's restrictions violated the Medicaid Act's reasonable standards provision by denying coverage of medically necessary services without any consideration of beneficiaries' medical needs, and violated the comparability provision by discriminating among categorically needy

---

[7] On December 13, 2012, plaintiffs filed an amended class complaint. The terms of that amended complaint do not differ meaningfully from the original for the purposes of this appeal.

beneficiaries on basis of their medical conditions. While concluding that the due process provision did not entitle plaintiffs to evidentiary hearings prior to the termination of their benefits, the judge held that New York had nevertheless violated that provision by implementing its restrictions without first providing written notice to individual beneficiaries. Finally, the court held that New York's plan amendments conflicted with both the ADA and Rehabilitation Act by treating some disabled individuals more favorably than others, and by putting plaintiffs at risk of institutionalization in violation of the integration mandate.

The district court thus concluded that plaintiffs were entitled to permanent injunctive relief, and directed the parties to "settle and submit a proposed Order concerning such injunctive relief" within fourteen days. Sp. App'x at 62. In light of the court's decision, NYSDH announced that it would cease enforcing its plan amendments, explaining that it would simply "return to its previous coverage policy" for orthopedic footwear and compression stockings. Joint App'x at 465. Subsequently, the district court entered a final order of judgment that, among other things, permanently enjoined NYSDH and its agents from enforcing the coverage restrictions against any beneficiaries under New York's Medicaid plan.

## DISCUSSION

We review a district court's order granting summary judgment *de novo*, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-moving party. Doe ex rel. Doe v. Whelan, 732 F.3d 151, 155 (2d Cir. 2013). We may affirm a grant of summary judgment only if the movant establishes that there is no genuine dispute as to any material facts and that the movant is entitled to judgment as a matter of law. Id.; see also Fed. R. Civ. P. 56(a).

We review a district court's grant of a permanent injunction for abuse of discretion. Shain v. Ellison, 356 F.3d 211, 214 (2d Cir. 2004). A district court abuses its discretion when "(1) its decision rests on an error of law . . . or a clearly erroneous factual finding, or (2) its decision – though not necessarily the product of a legal error or a clearly erroneous factual finding – cannot be located within the range of permissible decisions." ACORN v. United States, 618 F.3d 125, 133 (2d Cir. 2010) (internal quotation marks omitted). To prevail on a motion for a permanent injunction, a plaintiff must both succeed on the merits and demonstrate the "absence of an adequate remedy at law and irreparable harm if the relief is not granted." Roach, 440 F.3d at 56 (internal quotation marks

20

omitted). Because the Commissioner does not dispute either that plaintiffs will suffer irreparable harm if NYSDH continues to enforce its coverage restrictions or that plaintiffs lack an adequate remedy at law, the only issues before us are the merits of plaintiffs' statutory claims.

I.     Reasonable Standards Provision

First, plaintiffs claim that New York's coverage restrictions on orthopedic footwear and compression stockings violate the reasonable standards provision of the Medicaid Act by denying beneficiaries access to services on the basis of their diagnoses without regard to their medical needs.

The Medicaid Act provides that any state participating in the federal program must "include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which . . . are consistent with the objectives of this subchapter." 42 U.S.C. § 1396a(a)(17). As interpreted by HHS, that provision requires that each service administered by a state "be sufficient in amount, duration, and scope to reasonably achieve its purpose," 42 C.F.R. § 440.230(b), though a state may place "appropriate limits" on its services "based on such criteria as medical necessity or on utilization control procedures," id. § 440.230(d).

In 42 U.S.C. § 1983, Congress has created a cause of action whereby plaintiffs may sue a defendant "who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States]." 42 U.S.C. § 1983; see also Giordano v. City of New York, 274 F.3d 740, 750 (2d Cir. 2001). That language on its face might appear to permit plaintiffs to sue the Commissioner to vindicate their claims that New York's 2011 amendments violate the "laws" of the United States insofar as they are inconsistent with the reasonable standards provisions of 42 U.S.C. § 1396a(a)(17) and 42 C.F.R. § 440.230(b).

The Supreme Court, however, has interpreted § 1983 to create a cause of action only for violations of federal laws that "manifest[ ] an unambiguous intent to confer individual rights." Gonzaga Univ. v. Doe, 536 U.S. 273, 280 (2002) (internal quotation marks omitted). Federal laws that merely set standards on the basis of which states may receive federal funding, for example, but that do not create specific rights for individuals, are not enforceable by a civil action under § 1983. Id. at 283. Because the Medicaid Act's reasonable standards

22

provision addresses a state's general administrative duties under the Act, rather than defining individual beneficiaries' entitlements under that program, it does not appear to contain the type of rights-creating language necessary to confer a private cause of action. See Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. —, —, 135 S. Ct. 1378, 1387 (2015). Unsurprisingly, our sister courts of appeals to have considered the issue have thus concluded that the reasonable standards provision creates no such individual right. See Hobbs ex rel. Hobbs v. Zenderman, 579 F.3d 1171, 1182 (10th Cir. 2009); Lankford v. Sherman, 451 F.3d 496, 509 (8th Cir. 2006); Watson v. Weeks, 436 F.3d 1152, 1162 (9th Cir. 2006).

Plaintiffs, for their part, seem to concede that the reasonable standards provision creates no private right of action under § 1983. Instead, plaintiffs argue that the Supremacy Clause of Article VI of the United States Constitution endows them with independent authority to bring their statutory claim.[8]

This Court has previously held that where a state law conflicts with a federal statute, the Supremacy Clause creates a private cause of action to enforce

[8] The Supremacy Clause provides that the "Constitution, and the Laws of the United States, which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land," and that all courts "shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2.

the federal statute's superior requirements.  In <u>Burgio & Campofelice, Inc. v. New York State Department of Labor</u>, 107 F.3d 1000 (2d Cir. 1997), for example, we affirmed that "the Supremacy Clause creates an implied right of action for injunctive relief against state officers who are threatening to violate the federal Constitution or laws."  <u>Id</u>. at 1006 (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury</u>, 445 F.3d 136, 149 (2d Cir. 2006).

In its recent decision in <u>Armstrong</u>, however, the Supreme Court rejected that interpretation of Article VI.  As the Court noted, the "ample discussion" of the Supremacy Clause during the ratification debates included no mention of endowing individuals with private rights of action against the states – despite the fact that the constitutional creation of such a cause of action would have significantly restricted Congress's power to establish mechanisms for the enforcement of its own laws.  575 U.S. at —, 135 S. Ct. at 1383.  In context, the Court found it "apparent" that the Supremacy Clause simply "creates a rule of decision" by which courts are to resolve conflicts between state and federal laws. <u>Id</u>.  But it "is not the source of any federal rights, and certainly does not create a

24

cause of action" to enforce federal statutes that do not independently provide for private enforcement. Id. (internal citation and quotation marks omitted).

After concluding that the Supremacy Clause does not create a private right of action, the Supreme Court further determined that the language of the provision of the Medicaid Act at issue in the case, 42 U.S.C. § 1396a(a)(30)(A), at least when "coupled with the express provision of an administrative remedy," indicated that Congress intended to foreclose a private equitable remedy for violation of that provision. Armstrong, 135 S. Ct. at 1385. The provision at issue requires that state plans

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough provides so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

Id., quoting § 1396a(a)(30)(A). The Court concluded that the "broad[]," "complex[]," and "judgment-laden" nature of the provision's text made it

"judicially unadministrable." Id. Accordingly, the Court held that the provision was not privately enforceable by invoking the federal courts' equitable powers.

Plaintiffs' claim under the reasonable standards provision in this case rests entirely on an implied right of action arising out of the Supremacy Clause. Because the Court's decision in Armstrong denies the existence of any such right, Armstrong would thus seem to preclude their claim. Moreover, the language of the reasonable standards provision is similar to that of § 1396a(a)(30)(A), requiring that states "include reasonable standards . . . for determining eligibility." 42 U.S.C. § 1396a(a)(17). Indeed, a district court in our circuit recently noted that the provision "consists of a broad grant of discretion to the states," and that, "[l]ike [subs]ection 30(A), [the reasonable standards provision] focuses on programmatic aspects of the state plan as a whole, rather than on the specific benefits that must be accorded to individuals." Cruz v. Zucker, No. 14-CV-4456 (JSR), 2015 WL 4548162, at *11 (S.D.N.Y. July 29, 2015). The district court thus held that the reasonable standards provision "is not privately enforceable" under Armstrong." Id. We agree.

Plaintiffs object, however, that the Commissioner has waived his challenge to their right to enforce the reasonable standards provision – under Armstrong or

26

otherwise – because he did not raise that defense in opposition to plaintiffs' motion for summary judgment before the district court. It is true that, as a general matter, "a federal appellate court does not consider an issue not passed upon below." Baker v. Dorfman, 239 F.3d 415, 420 (2d Cir. 2000), quoting Singleton v. Wulff, 428 U.S. 106, 120 (1976). Yet because "waiver rules are prudential and not jurisdictional," we may exercise discretion to address an issue not raised properly before the district court. Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 446 (2d Cir. 2006). We are most likely to exercise such discretion "(1) where consideration of the issue is necessary to avoid manifest injustice, or (2) where the issue is purely legal and there is no need for additional fact-finding." Baker, 239 F.3d at 420 (internal quotation marks omitted). A party's assertion of a claim earlier in the proceedings, as well as a lack of prejudice to the opposing party, may also weigh in favor of considering new claims. See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 45-46 (2d Cir. 2005) (subsequent history omitted).

Although the Commissioner did not raise his Supremacy Clause objection in his summary judgment papers before the district court, he included it in his

initial answer to plaintiffs' complaint and in his opposition to plaintiffs' motion for a preliminary injunction. Indeed, plaintiffs' extensive briefing on this issue on appeal demonstrates that plaintiffs suffered no unfair surprise or prejudice from defendant's failure to argue the matter in opposition to summary judgment. Furthermore, the Commissioner's objection to plaintiffs' assertion of a cause of action based on the Supremacy Clause raises a discrete question of law – one recently clarified by and readily resolved in light of the Supreme Court's decision in <u>Armstrong</u> – that is dispositive of plaintiffs' reasonable standards claim. Under these circumstances, we find it appropriate to exercise our discretion to resolve the Commissioner's objection on the merits.

Because <u>Armstrong</u> forecloses plaintiffs' claim that the Supremacy Clause endows them with an implied right of action to enforce the reasonable standards provision, defendant is entitled to summary judgment on plaintiffs' claim under § 1396a(a)(17).

II.      <u>Home Health Services</u>

Second, plaintiffs claim that New York's coverage restrictions for orthopedic footwear and compression stockings based on a beneficiary's medical condition violates the Medicaid Act's home health services provision by denying

28

beneficiaries access to obligatory medical "equipment" or "supplies."  We agree

with the district court that this claim is unpersuasive.[9]

Under the home health services provision, a state participating in the

federal Medicaid program must provide "home health services for any

individual who, under the State plan, is entitled to nursing facility services."  42

U.S.C. § 1396a(a)(10)(D).  The parties do not dispute that New York's Medicaid

plan provides nursing facilities services to both the categorically needy and the

medically needy, and that New York is consequently obligated to provide home

health services to both groups.  They dispute, however, whether orthopedic

---

[9] We note that, in contrast to Plaintiffs' claim under the reasonable standards provision, the Commissioner *has* waived any argument that their claim under the home health services provision is not privately enforceable.  The Commissioner did not make such an argument in its brief on appeal, nor did it attempt to assert any such argument in its letter, pursuant to Rule 28(j), Fed. R. App. P., calling the Armstrong case to our attention.  In our view, it was wise to forgo such an argument.  Unlike the reasonable standards provision and the provision at issue in Armstrong, the text of the home health services provision focuses on "the specific benefits that must be accorded to individuals," Cruz, 2015 WL 4548162, at *11, expressly requiring that state plans provide certain specific benefits for individual beneficiaries; the provision mandates "the inclusion of home health services *for any individual*."  42 U.S.C. § 1396a(a)(10)(D) (emphasis added).  That is not the type of broad, complex, judgment-laden language that, Armstrong held, precludes private enforcement.  Rather, it is specific, benefit-creating language that confers rights on Medicaid recipients, enforceable under § 1983.

footwear or compression stockings qualify as "home health services" so as to trigger that requirement.

As a preliminary matter, the Commissioner insists that CMS implicitly found that orthopedic footwear and compression stockings qualify as "prosthetics" when it excused New York from seeking further agency approval of its proposed coverage restrictions – permission CMS could have given only if it deemed New York's plan amendments consistent with the home health services provision. As a general principle, we owe a "significant measure of deference to CMS's interpretation" of the Medicaid Act, Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 137 (2d Cir. 2002), including to its "implicit judgment" that "a state plan complies with federal law" in approving that plan, id. at 140, as well as to "relatively informal" communications, such as letters from local administrators, id. at 138. In this case, however, CMS has submitted an *amicus* brief explicitly disclaiming that its communications with NYSDH reflected any measured consideration of New York's plan amendments entitled to judicial deference. See U.S. CMS *Amicus* Br. at 8-9.[10] Because that representation

_____

[10] Two *amicus* briefs have been filed on behalf of the United States in this case: one from the Department of Justice, addressing plaintiffs' disability discrimination claims, and one from CMS, addressing plaintiffs' Medicaid Act claims. All

30

certainly merits deference from this Court, we proceed to address the merits of plaintiffs' home health services claim de novo.

The Medicaid Act does not define the meaning of "home health services." See 42 U.S.C. § 1396a(a)(10)(D). Implementing regulations issued by HHS explain that such services include "[m]edical supplies, equipment, and appliances suitable for use in any setting in which normal life activities take place," 42 C.F.R. § 440.70(b)(3) (effective July 1, 2016). In July 2011, CMS issued a proposed rule containing more specific definitions of both "supplies" and "equipment." The final rule was issued on February 2, 2016. See Medicaid Program; Face-to-Face Requirements for Home Health Services; Policy Changes and Clarifications Related to Home Health, 81 Fed. Reg. 5530, 5566-67 (Feb. 2, 2016) (codified at 42 C.F.R. § 440.70). The rule defines medical "supplies" as "health care related items that are consumable or disposable, or cannot withstand repeated use by more than one individual," and medical "equipment and appliances" as "items that are primarily and customarily used to serve a medical purpose, generally are not useful to an individual in the absence of a disability,

_____

references to the United States's *amicus* brief during our discussion of plaintiffs' Medicaid Act claims are to that latter brief.

31

illness or injury, can withstand repeated use, and can be reusable or removable."

42 C.F.R. § 440.70(b)(3)(i)-(ii) (effective July 1, 2016). We owe CMS's definitions a

"significant measure of deference." Cmty. Health Ctr., 311 F.3d at 137. As

discussed in greater detail below, however, we find the definitions in the rule,

which seem intended primarily to distinguish durable "equipment" from

consumable "supplies," less than helpful in answering the question before us.

The definitions are so general that, if applied literally as a description of what

items must be provided under the rubric of "home health services," they would

mandate the provision of any "health care related items" whatsover.

Independent of its obligation to cover home health services, a state

participating in Medicaid may also elect to provide beneficiaries with a variety of

optional benefits, including "prosthetic devices." 42 U.S.C. § 1396d(a)(12). In

contrast to its broad and general definition of "home health services,"

"equipment," and "supplies," HHS has adopted a relatively specific definition of

"prosthetic devices." That term encompasses

> replacement, corrective, or supportive devices prescribed
> by a physician or other licensed practitioner of the healing
> arts . . . to – (1) Artificially replace a missing portion of the
> body; (2) Prevent or correct physical deformity or

malfunction; or (3) Support a weak or deformed portion of the body.

42 C.F.R. § 440.120(c).  As purely elective features in a state Medicaid plan, prosthetic devices are exempt from the requirements of § 1396a(a)(10)(D).  See Rodriguez, 197 F.3d at 616 n.3.

Under both New York's statutory definitions and a common-sense understanding of the terms, both orthopedic footwear and compression stockings fall squarely within the federal definition of "prosthetic devices."  The New York regulations define "orthopedic footwear" as shoes or modifications used "to correct, accommodate or prevent a physical deformity or range of motion malfunction . . . ; to support a weak or deformed structure of the ankle or foot . . . ; or to form an integral part of an orthotic brace."  18 N.Y.C.R.R. § 505.5(a)(4).  Similarly, compression stockings are, by definition, designed to support weakened limbs, exerting pressure to comfort aching legs, alleviate pain from varicose veins, and minimize debilitating swelling.  See Joint App'x at 353. These functions align neatly with the definition of "prosthetic devices" adopted by HHS at 42 C.F.R. § 440.120(c).

33

Furthermore, New York itself appears to classify orthopedic footwear and compression stockings within the category of "prosthetics." When the New York legislature enacted its new coverage restrictions in 2011, it codified those restrictions under § 365-a(2)(g) of the New York Social Services Law, which addresses New York's provision of "sickroom supplies, eyeglasses, prosthetic appliances, and dental prosthetic appliances." See N.Y. Soc. Serv. Law § 365-a(2)(g). Orthopedic footwear and compression stockings certainly do not fall within the category of "eyeglasses" or "dental prosthetic appliances." Nor do they plausibly qualify as "sickroom supplies," which, lacking any more specific guidance in the Social Services Law or agency regulations, we must interpret per their common-sense meaning as supplies produced for and used during medical confinement. See Merriam-Webster's Collegiate Dictionary 1089 (10th ed. 1998) (defining "sickroom" as "a room in which a sick person stays" or "a room in which a person is confined by sickness"); 15 Oxford English Dictionary 418 (2d ed. 1989) (defining "sickroom" as "[a] room occupied by, and set apart for, the sick").[11] If only by process of elimination, New York's codification of its coverage

_____

[11] While the reference to "sickroom supplies" in § 365-a(2)(g) might conceivably be read as equivalent to the broader category of "medical . . . supplies" in § 365-a(2), the statute's repeated references to additional subsets of "supplies"

34

restrictions on orthopedic footwear and compression stockings in § 365-a(2)(g) suggests that it classified such services as "prosthetic appliances."

Plaintiffs note that NYSDH's regulations define the term "compression footwear" separately from "prosthetic appliances" – a distinction they claim establishes that New York does not view such services purely as "prosthetics" within the scheme of its Medicaid program. See 18 N.Y.C.R.R. § 505.5(a). We do not assign that distinction as much significance as plaintiffs would attribute to it. While plaintiffs are correct that the definitions section of § 505.5 includes separate entries for "[o]rthopedic footwear" and "[p]rosthetic appliances," see id. §§ 505.5(a)(4), (5), that section also includes separate entries for "[d]urable medical equipment" and "[m]edical/surgical supplies," see id. §§ 505.5(a)(1), (2).[12]

---

suggests that those two terms are not coterminous. See N.Y. Soc. Serv. Law § 365-a(2)(b) (addressing "supplies in a general hospital"); id. § 365-a(2)(f) (addressing "preventive, prophylactic and other routine dental . . . supplies"). Similarly, NYSDH's regulations consistently draw distinctions between those two terms. See 18 N.Y.C.R.R. § 540.6(b)(1)(iii)(c) (noting that category of "[m]edical supplies" "includ[es] sickroom supplies"); id. § 387.12(c)(1) (differentiating between "medical supplies, sickroom equipment or other prescribed equipment").

[12] Although the regulations' reference to "[d]urable" medical equipment may seem to diverge from the broad category of "medical equipment" under 42 C.F.R. § 440.70(b)(3), New York's definition in fact closely echoes CMS's own definition of "equipment and appliances." Compare 18 N.Y.C.R.R. § 505.5(a)(1)

The fact that New York's regulations include an independent entry for orthopedic footwear thus does not prevent orthopedic footwear from qualifying as optional "prosthetics" any more than it prevents it from qualifying as mandatory "equipment" or "supplies."  Nor does NYSDH's decision to define orthopedic footwear separately from prosthetics in § 505.5(a) change the fact that NYSDH's actual definition of that term falls squarely within the federal understanding of "prosthetic devices" at 42 C.F.R. § 440.120(c), or that the New York legislature listed both orthopedic footwear and compression stockings under the category of "prosthetic appliances" at § 365-a(2)(g).  We accord more weight to those facts than to any inferences to be drawn from NYSDH's decision to list compression footwear separately from both "prosthetic[s]" and "equipment" or "supplies" in its definitions section.

_____

(defining "[d]urable medical equipment" as prescribed "devices and equipment . . . which . . . (i) can withstand repeated use for a protracted period of time; (ii) are primarily and customarily used for medical purposes; (iii) are generally not useful to a person in the absence of an illness or injury; and (iv) are usually not fitted, designed or fashioned for a particular individual's use"), with 42 C.F.R. § 440.70(b)(3)(ii)(effective July 1, 2016) (defining medical "equipment and appliances" as "items that are primarily and customarily used to serve a medical purpose, generally are not useful to an individual in the absence of a disability, illness or injury, can withstand repeated use, and can be reusable or removable").

Plaintiffs also emphasize that New York's coverage guidelines for medical

providers list compression stockings under the categories of both"Prosthetics"

and "Medical/Surgical Supplies." See New York State Medicaid Program,

Durable Medical Equipment, Orthotics, Prosthetics, and Supplies: Procedure

Codes and Coverage Guidelines, Version 2012-1, at 151 (4/2012) (listing "gradient

compression stockings" under "Prosthetics"); id. at 17 (listing "[s]urgical

stockings" under "Supplies"). We find that fact even less compelling. New

York's provider manual does not create law, but simply provides guidance to

medical suppliers in dispensing their products. To that end, NYSDH asserts –

and plaintiffs do not dispute – that the sole purpose of classifying surgical

stockings as "[m]edical/surgical supplies" was to make those services available

for distribution at local pharmacies, rather than through specialized dealers.

Furthermore, to the extent that the provider manual includes "[s]urgical

stockings" in the category of "Medical/Surgical Supplies," it further specifies that

this classification applies only to stockings used "for treatment of severe

varicosities and edema during pregnancy" – a definition consistent with New

York's coverage restrictions. Id. at 17. The provider manual thus does not even

clearly conflict with – much less undermine – New York's classification of

37

orthopedic footwear and compression stockings as prosthetics under § 365-a(2)(g).

Plaintiffs argue that, even if orthopedic footwear and compression stockings qualify as "prosthetics" under New York's plan, they may nevertheless be subject to the home health services requirements so long as they *also* qualify as medical equipment or supplies. To that end, plaintiffs insist that orthopedic footwear and compression stockings fit easily within CMS's definition of medical "equipment," as items that primarily "serve a medical purpose," are "not useful to an individual in the absence of a disability, illness or injury," can "withstand repeated use," and can be "reusable or removable." See 42 C.F.R. § 440.70(b)(3)(ii) (effective July 1, 2016).

We have our reservations as a matter of law about plaintiffs' suggestion that services falling squarely within the definition of optional "prosthetics" may nevertheless qualify as mandatory services under the Medicaid Act. Regardless, we need not resolve whether or under what circumstances that theory of the Medicaid Act might prevail, because we conclude that plaintiffs' approach is plainly inappropriate in the circumstances of this case.

As noted above, the federal definition of "home health services" is exceedingly broad. HHS states that such services include "[m]edical supplies, equipment, and appliances suitable for use in any setting in which normal life activities take place," but it does not explain what sorts of items those "supplies, equipment, and appliances" might comprise. See 42 C.F.R. § 440.70(b)(3) (effective July 1, 2016). Extended literally to encompass any item of equipment or medical appliance that an individual can use in a non-institutionalized setting, HHS's definition would necessarily encompass most if not all "prosthetic appliances." Such a broad reading would plainly contradict Congress's intent in identifying a separate category of prosthetic appliances as purely elective Medicaid services.

CMS's elaborations of the terms "supplies, equipment, and appliances" do little to remedy this problem. The rule defines "supplies" as "health care related items that are consumable or disposable, or cannot withstand repeated use by more than one individual," and defines "equipment and appliances" as items that "are primarily . . . used to serve a medical purpose, generally are not useful to an individual in the absence of a disability, illness or injury, can withstand repeated use, and can be reusable or removable." 42 C.F.R. § 440.70(b)(3)(i)-(ii)

39

(effective July 1, 2016).  Whittled down to their essence, those definitions essentially characterize medical "supplies" and "equipment" as, respectively, items for medical use that cannot withstand repeated use by an individual, and items for medical use that *can* withstand such use.  Applied with no room for exception, those definitions would absorb the entire universe of prosthetic appliances, and much else, under the umbrella of obligatory services.

In context, we must assume that HHS's more specific definition of "prosthetic devices" in 42 C.F.R. § 440.120(c) carves out precisely such an exception, exempting any items described therein from mandatory coverage under the home health services provision.  Indeed, that reading is the necessary consequence of the familiar canon of statutory construction that a "specific provision takes precedence over a more general" one.  United States v. Torres-Echavarria, 129 F.3d 692, 700 n.3 (2d Cir. 1997).  As the Supreme Court has recently affirmed, that canon dictates that where "a general permission or prohibition is contradicted by a specific prohibition or permission," the "specific provision is construed as an *exception* to the general one."  RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. —, —, 132 S. Ct. 2065, 2071 (2012) (emphasis added).  That principle provides an apt guide to the interaction

between optional prosthetics and mandatory home health services under the Medicaid Act. Given the sheer breadth of HHS's definition of "home health services" and its relative precision in defining "prosthetic devices," the close overlap between orthopedic footwear and compression stockings and HHS's definition of optional prosthetics suggests that those services fall within a statutory exception to the obligatory provisions of the home health services clause.

That conclusion, moreover, makes eminent sense. The coverage of home health services is made mandatory for states that also provide nursing facility services, and is intended to permit patients who would otherwise be confined to nursing home facilities to receive equivalent treatment more economically in their own homes. The items covered by the home health services provision are thus primarily the types of medical supplies and equipment available in nursing homes as a matter of course, but not typically available in ordinary residences or community settings. Prosthetic devices such as artificial limbs are not aspects of that sort of care, but rather are permanent or long-lasting substitutes or supports for "missing," "weak or deformed portion[s] of the body." 42 C.F.R. § 440.120(c). Such devices transcend the "sickroom" and may be used by individuals who

41

have no need of ongoing care in a nursing facility or in the home. It thus makes sense that their availability should be determined by separate rules.

Finally, in an *amicus* brief to the Court, the United States suggests that even if the federal Medicaid Act's definition of home health services is too vague to provide useful guidance, a state itself may define medical "equipment" or "supplies" so as to classify particular items as both prosthetics and mandatory home health services. That is to say, if New York defined medical "equipment" or "supplies" with sufficient generosity and specificity to clearly encompass orthopedic footwear and compression stockings, the United States insists that we would need to defer to that definition and treat those items as mandatory within New York's Medicaid plan.

That theory offers plaintiffs no solace in this case, however, where New York's definitions of medical equipment and supplies flatly preclude the conclusion that orthopedic footwear and compression stockings – or, indeed, any "prosthetics" under New York's plan – also qualify as home health services. Section 505.5(a)(1) of NYSDH's regulations define "[d]urable medical equipment" as medical "devices and equipment, *other than prosthetic or orthotic appliances*," that can withstand protracted use and are not usually fitted or

42

designed for any individual recipient. 18 N.Y.C.R.R. § 505.5(a)(1) (emphasis

added). Similarly, § 505.5(a)(2) defines medical "supplies" as "items for medical

use *other than . . . prosthetic or orthotic appliances, durable medical equipment, or*

*orthopedic footwear*" that are consumable and non-reusable. Id. § 505.5(a)(2)

(emphasis added). Those definitions explicitly exclude from the New York's

understanding of "equipment" or "supplies" either orthopedic footwear or, more

broadly, any items that also qualify as "prosthetics" – a category that includes,

per N.Y. Soc. Serv. Law § 365-a(2)(g), prescription footwear and compression

stockings.[13] Because New York's definitions of medical supplies or equipment do

not plausibly encompass either orthopedic footwear or compression stockings –

or, indeed, allow any overlap with the category of "prosthetics" within New

_____

[13] The fact that § 505.5(a)(2), but not § 505.5(a)(1), also explicitly excludes "orthopedic footwear" might be taken to suggest that orthopedic footwear indeed qualifies as medical equipment. We decline to adopt that reading. First, since § 505.5(a)(2) also excludes "equipment" from its definition of supplies, while § 505.5(a)(1) does not exclude "supplies" from its definition of equipment, the list of exceptions at § 505.5(a)(2) is clearly non-exhaustive. Furthermore, excluding "orthopedic footwear" from § 505.5(a)(1)'s definition of "equipment" may have been less necessary than excluding it from § 505.5(a)(2)'s definition of "supplies," since § 505.5(a)(1)'s stipulation that medical equipment is not usually "fitted . . . for a particular individual's use" would appear to exempt orthopedic footwear in any case.

York's plan – those definitions cannot bring such services under the category of mandatory "home health services."

We thus agree with the Commissioner that orthopedic footwear and compression stockings qualify as optional "prosthetics" rather than obligatory "equipment" or "supplies" under New York's Medicaid plan. The district court thus properly entered summary judgment in favor of defendant on plaintiffs' home health services claim.

III.    Due Process Provision

Third, plaintiffs claim that New York violated the Medicaid Act's due process provision by implementing its new coverage restrictions on orthopedic footwear and compression stockings without providing affected beneficiaries notice of the changes or an opportunity to request evidentiary hearings to contest them.[14]

---

[14] As with the home health care provision, the Commissioner raises no claim that the due process provision is not privately enforceable pursuant to § 1983. Once again, we agree. The due process language also contains clear and specific benefit-creating language, requiring that state plans provide "an opportunity for a fair hearing . . . *to any individual* . . . with reasonable promptness. 42 U.S.C. § 1396a(a)(3) (emphasis added).

The Medicaid Act requires that any state participating in Medicaid "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied." 42 U.S.C. § 1396a(a)(3). Consistent with that requirement, HHS's regulations specify that, "[a]t the time of any action affecting [a beneficiary's] claim," the state must "inform every applicant or beneficiary in writing" of (1) his right to a hearing, (2) the method by which he may obtain a hearing, and (3) his right of representation at the proceedings. 42 C.F.R. §§ 431.206(c)(2), (b). The "notice required under § 431.206(c)(2)" must contain five pieces of information: (1) a statement of the state's intended action, (2) its reasons for that action, (3) the federal or state law that supports or requires that action, (4) an explanation of whether and under what circumstances the beneficiary may obtain an evidentiary hearing, and (5) an explanation of the circumstances under which the beneficiary's coverage will be continued. Id. § 431.210.

Despite the general requirement of an evidentiary hearing, HHS has specified that no state is obliged to grant a beneficiary such a hearing where "the sole issue is a Federal or State law requiring an automatic change adversely affecting some or all beneficiaries." Id. § 431.220(b). Accordingly, where a state

45

amends its Medicaid plan so as to eliminate a certain branch of coverage, beneficiaries who contest that amendment as a matter of law but "fail[ ] to raise a valid factual dispute about their eligibility for coverage" under the new scheme are not entitled to a hearing. Rosen v. Goetz, 410 F.3d 919, 926 (6th Cir. 2005) (internal quotation marks omitted); see also id. at 927 (noting CSM's approval of that interpretation). No similar exception applies, however, to a state's duty to provide *notification* of its intended plan changes under § 431.206.

Because plaintiffs raise no factual disputes about their right to coverage under New York's Medicaid plan, as modified by the 2011 amendments, § 431.220(b) excuses NYSDH from having to provide plaintiffs with evidentiary hearings prior to terminating their benefits. Nevertheless, since § 431.206 and § 431.210 still oblige New York to provide written notice of any "action affecting [a beneficiary's] claim," id. § 431.206(c)(2), NYSDH violated the Medicaid Act's due process provision by failing to inform plaintiffs of its upcoming changes in coverage prior to termination.

The Commissioner challenges this latter conclusion on two grounds. First, he suggests that, per the Supreme Court's decision in Atkins v. Parker, 472 U.S. 115 (1985), the legislative process surrounding New York's adoption of its plan

46

amendments provided sufficient inquiry notice to satisfy the Medicaid Act's due process requirements. We disagree.

In Atkins, the Supreme Court dismissed plaintiffs' claim that they were entitled to individualized notice prior to benefit reductions under the Food Stamp Act, alerting them not only to the general change in law but also its precise effects on each of their households. Id. at 117, 121. Unlike the present case, there was no dispute in Atkins that the statutory scheme required, and that the state had in fact *provided,* written notice to all beneficiaries of the general changes to the aid program – the only right claimed by plaintiffs here. See id. at 123-27. In evaluating plaintiffs' subsequent claim that such generalized notice violated their *constitutional* due process rights, the Atkins Court held – as the Commissioner now emphasizes – that Congress's "legislative determination" to amend the Food Stamp Act "provide[d] all the process that [wa]s due." Id. at 130 (internal quotation marks omitted). As a constitutional matter, that holding proceeds inevitably from the principle that "[a]ll citizens are presumptively charged with knowledge of the law." Id. Yet that principle does nothing to relieve New York of its duty to comply with the Medicaid Act's *statutory* requirements that a state

47

provide written notice of "any action affecting [a beneficiary's] claim." 42 C.F.R. § 431.206(c)(2).

Alternatively, the Commissioner argues that, even if NYSDH violated the Medicaid Act's due process provision by failing to provide written notice of its coverage changes, that failure was harmless error. Based on the record – not least, the fact that plaintiffs brought this timely lawsuit challenging New York's proposed restrictions – the Commissioner insists that the absence of written notice did not deprive plaintiffs of any meaningful opportunities to protect their statutory rights.

The Commissioner's argument is facile at best. Where a statute explicitly prescribes procedures to be followed by a state agency prior to taking certain actions, the agency cannot avoid an injunction demanding compliance with those requirements by assigning plaintiffs the burden of demonstrating why such procedural requirements – enacted in a direct exercise of Congress's legislative judgment – are worth respecting in any given instance. As we have repeatedly recognized, § 1396a(a)(3) and its accompanying regulations endow individual beneficiaries under the Medicaid Act with an enforceable right to receive due process prior to state actions affecting their claims – including the right to receive

48

written notice of policy changes. See Shakhnes v. Berlin, 689 F.3d 244, 254 (2d Cir. 2012) (§ 1396a(a)(3) "creates a right . . . enforceable under § 1983"); Granato v. Bane, 74 F.3d 406, 408 (2d Cir. 1996) (state action terminating Medicaid services "trigger[s] the recipient's right to notice, a hearing, and the continuation of . . . services pending that hearing"). The fact that a handful of named plaintiffs managed to bring a federal lawsuit challenging the legality of New York's coverage restrictions despite having received no notice of those restrictions is hardly an adequate response to plaintiffs' complaint that New York deprived them of the administrative process promised them by the Medicaid Act.

In any event, the record demonstrates that NYSDH's failure to provide written notice of its coverage restrictions in fact caused plaintiffs direct and practical harm. Absent such advance notice, plaintiffs had to endure the cost, inconvenience, and distress of seeking to refill their prescriptions, only to have their requests rejected by their providers or pharmacists. They suffered the disadvantage of receiving no opportunity to ration their current items or to find novel means to obtain replacements in light of advance knowledge that their Medicaid coverage was set to expire. And even once they learned from their providers that their benefits had been discontinued, they received no notification

49

of their right to a hearing and renewed benefits should their factual circumstances change.  See 42 C.F.R. §§ 431.210(d)(2), (e).  Under such circumstances, NYSDH's failure to abide by the procedural requirements of the Medicaid Act's due process provision was hardly "harmless."

We thus agree with the district court that defendant is entitled to summary judgment on plaintiffs' due process claim with respect to plaintiffs' right to have received evidentiary hearings prior to the termination of their Medicaid benefits, but that plaintiffs are entitled to summary judgment with respect to their right to have received written notice of the coverage restrictions prior to termination. Plaintiffs' injunctive relief on this ground should be limited to an order barring implementation of NYSDH's restrictions pending the provision of written notice to affected beneficiaries.  See Eder v. Beal, 609 F.2d 695, 702 (3d Cir. 1979); Catanzano by Catanzano v. Dowling, 847 F. Supp. 1070, 1086 (W.D.N.Y. 1994).

IV.    Comparability Provision

Fourth, plaintiffs argue that New York's coverage restrictions violate the Medicaid Act's comparability provision by providing lesser medical services to some categorically needy individuals than to others with the same medical needs.

The comparability provision of the Medicaid Act seeks to ensure that the categorically needy receive maximum access to benefits provided under a state Medicaid plan, guaranteeing that "the primary concern of the states in providing financial assistance [rests with] those persons who lack sufficient income to meet their basic needs." Camacho v. Perales, 786 F.2d 32, 38 (2d Cir. 1986). Pursuant to that goal, the provision imposes two requirements on any state participating in the federal program. First, "the medical assistance made available to any [categorically needy] individual . . . shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i); Rodriguez, 197 F.3d at 615. Second, such medical assistance "shall not be less in amount, duration, or scope than the medical assistance made available to [non-categorically needy] individuals." 42 U.S.C. § 1396a(a)(10)(B)(ii).[15] Elaborating on both elements, HHS's implementing

[15] As with the home health services and due process claims, and in contrast to the reasonable standards claims, the Commissioner does not argue that the comparability provision is not enforceable under § 1983. In cases decided before Armstrong, courts of appeals, including this one, have commonly adjudicated private suits seeking to enforce a state's compliance with the comparability provision, see, e.g., Rodriguez, 197 F.3d at 615-16; Schott v. Olszewski, 401 F.3d 682, 686-87 (6th Cir. 2005) – even while simultaneously denying the existence of any such private right of action to enforce the reasonable standards provision, see Lankford, 451 F.3d at 505-09. Such claims remain viable after Armstrong, as the

51

regulations reiterate that the comparability provision demands that all state

Medicaid plans comply with two separate criteria: both "that the services

available to any categorically needy beneficiary . . . are not less in amount,

duration, and scope than those services available to a *medically needy* beneficiary,"

42 C.F.R. § 440.240(a) (emphasis added), and "that the services available to any

individual in the ['categorically needy' group] are equal in amount, duration, and

scope for all beneficiaries *within the group*," id. § 440.240(b) (emphasis added).

Those requirements apply equally to mandatory and optional medical services.

Lankford, 451 F.3d at 505.

As § 1396a(a)(10)(B)(i) establishes and HHS's regulations clarify, the

comparability provision does not protect categorically needy beneficiaries simply

by prohibiting states from treating them less favorably than the medically needy.

It also prohibits states from discriminating *among* the categorically needy by

"provid[ing] benefits to some categorically needy individuals but not to others."

comparability provision contains specific benefits-creating language, mandating
that "the medical assistance made available to any [categorically needy]
individual . . . shall not be less in amount, duration, or scope than the medical
assistance made available to any other such individual." 42 U.S.C.
§ 1396a(a)(10)(B). This provision guarantees a certain level of benefits to
categorically needy individuals, and provides a specific standard by which to
measure that benefit.

<u>Rodriguez</u>, 197 F.3d at 615. That prohibition includes providing different amounts, durations, or levels of medical care to different individual beneficiaries within any one categorically needy group. <u>Id</u>.; <u>White v. Beal</u>, 555 F.2d 1146, 1149 (3d Cir. 1977) ("[A]ll persons within a given category must be treated equally."); <u>Becker v. Toia</u>, 439 F. Supp. 324, 333 (S.D.N.Y. 1977) ("[E]ach person . . . shall be eligible for the same 'amount, duration and scope' of coverage as all the others in his or her group . . . ."); <u>see</u> <u>also</u> <u>Sobky v. Smoley</u>, 855 F. Supp. 1123, 1140-41 (E.D. Cal. 1994) (listing cases).[16]

The Commissioner does not dispute that plaintiffs include categorically needy individuals, nor that all the plaintiffs, no matter their diagnoses, have a genuine medical need for orthopedic footwear or compression stockings. By denying plaintiffs access to such services purely on the basis of the nature of their

_____

[16] Section 440.240(b) also demands "that the services available to any individual in the ['medically needy' group] are equal in amount, duration, and scope for all beneficiaries within the group," suggesting that the comparability provision may prohibit a state from providing unequal services to individuals within each subset of the *medically needy*. <u>See</u> 42 C.F.R. § 440.240(b)(2). To the extent that § 440.240(b)(2) bars discrimination among medically needy individuals, however, it appears to reach beyond the text of § 1396a(a)(10)(B). Regardless, plaintiffs do not claim that New York is prohibited from discriminating on the basis of medical condition among the medically needy, arguing only that it may not do so with respect to the categorically needy. <u>See</u> Appellees' Br. at 39-41.

medical conditions, New York's restrictions thus provide some categorically needy individuals lesser medical assistance than is available to others with the same levels of medical need. By definition, such a selective distribution of medical assistance offers an unequal "scope" of benefits to individuals within the categorically needy class, violating the plain language of § 1396a(a)(10)(B)(i) and § 440.240(b).

In an *amicus* brief to this Court, the United States suggests that our resolution of plaintiffs' claim depends on the breadth with which New York defines the "purpose" of orthopedic footwear and compression stockings under its plan. If, for example, New York's designated purpose in providing orthopedic footwear were to aid growth in children, or if its purpose in providing compression stockings were to reduce swelling during pregnancy, then New York could restrict coverage of those services to children and pregnant women while nevertheless providing "equal access" to such services for all categorically needy individuals. If, by contrast, New York defined the purpose of those services simply as relieving pain or enhancing mobility, then § 1396a(a)(10)(B) would require it to provide those benefits to all categorically needy individuals with an equivalent medical need for such services. The crucial distinction, the

United States thus suggests, is between adopting a medical service with a broad

purpose and then limiting access to that service only to some categorically needy

beneficiaries, which would violate the comparability provision, and adopting a

service tailored to treating only certain conditions, which a state may do without

running afoul of § 1396a(a)(10)(B).

Portions of the record in fact suggest that New York restricted the purpose

of orthopedic footwear – though not compression stockings – under its plan to

treating limited medical conditions.[17] During the 2011 revisions to its regulations,

_____

[17] The United States suggests that the record fails to clarify New York's intended purpose in providing such services, and that we should consequently abstain from resolving plaintiffs' challenge absent additional discovery. We disagree.

First, the United States's assessment of the record overlooks New York's explicit definition of "orthopedic footwear" at § 505.5, discussed below. Even assuming that the record did not establish New York's intent, however, that deficiency would not preclude us from reaching plaintiffs' claim. To the extent that New York has failed to establish the purpose behind its provision of orthopedic footwear and compression stockings on the record, that failure would simply compel us to conclude, for the purposes of this appeal, that New York had no specialized definition in mind. Absent any reason to believe that New York understood those services as limited to only a selective subset of their common uses, we could only assume that the purpose of such services was to provide the sorts of medical benefits with which they are typically associated. Cf. N.Y. Soc. Serv. Law § 365-a(2) (broadly defining "standard" coverage under New York's Medicaid program as services "necessary to prevent, diagnose, correct or cure conditions . . . that cause acute suffering, . . . result in illness or infirmity, interfere with [a] capacity for normal activity, or threaten some significant handicap . . .").

NYSDH also amended the definition of "orthopedic footwear" under § 505.5(a)(4) to comport with New York's new coverage restrictions. Where previous versions of § 505.5 had defined orthopedic footwear as shoes or inserts used to "correct, accommodate or prevent a physical deformity or range of motion malfunction," "support a weak or deformed structure of the ankle or foot," or "form an integral part of a brace," 18 N.Y.C.R.R. § 505.5(a)(4) (effective until Apr. 6, 2011), the new regulations defined that term as any shoe or insert used

> *in the treatment of children*, to correct, accommodate or prevent a physical deformity or range of motion malfunction . . . ; *in the treatment of children*, to support a weak or deformed structure of the ankle or foot; as a component of a comprehensive *diabetic treatment plan* to treat [various conditions and deformities]; or to form an integral part of an *orthotic brace*.

18 N.Y.C.R.R. § 505.5(a)(4) (effective Apr. 6, 2011) (emphases added). That definition, which provides the best record evidence of New York's intended purpose in providing orthopedic footwear under its Medicaid plan, would appear to exemplify the type of limited statutory definition that the United States suggests may excuse New York's restrictions from violating the comparability provision.

Nevertheless, we cannot accept the United States's proposition that the comparability provision defers to a state's definition of the "purpose" of any given service – a proposition it presents without citing any legal authority in support – as a correct interpretation of the Medicaid Act. We do not question that a state may, within reason, define the scope and purpose of the services it provides under its Medicaid plan, especially when those services are purely elective. Yet allowing a state to deny medical benefits to some categorically needy individuals that it provides to others with the exact same medical needs simply by defining such services – however arbitrarily – as aimed at treating only some medical conditions would risk swallowing the comparability provision whole. If, for example, New York defined the purpose of an arm cast as supporting regrowth of broken bones in the right arm only, or defined the purpose of a prosthetic leg as enhancing mobility in disabled individuals born without limbs, surely it would violate the comparability requirement to deny equivalent services to categorically needy individuals who break their left arms, or who lose limbs through amputation, but who have the same indisputable medical needs for a cast or prosthetic. Such a scenario would seem an archetypal

instance of denying some categorically needy individuals the same "scope" of medical assistance available to others under a state plan.

Medical services are always, by nature, diagnosis-specific, and rarely are two diagnoses or medical histories exactly alike. Once we accept the principle that the comparability provision prohibits discrimination among *individuals* as well as groups, see 42 C.F.R. § 440.240(b), it follows that that provision prohibits discrimination among individuals with the same medical needs stemming from different medical conditions. See Rolland v. Cellucci, 52 F. Supp. 2d 231, 238 (D. Mass. 1999) (noting cases holding "that the comparability provision is violated if there is a disparity of treatment among the categorically needy even when those individuals have differing disabilities"); Parry By & Through Parry v. Crawford, 990 F. Supp. 1250, 1257 (D. Nev. 1998) (holding that comparability provision prohibits denial of services to categorically needy individuals with different medical conditions but equivalent needs). To the extent that such a provision might be read simply as precluding discrimination among individuals with the *very same* medical conditions, indeed, it would simply govern the equitable administration of a state plan, not the formal terms of that plan, which are explicitly at issue in the prohibition. See 42 U.S.C. § 1396a(a)(10) ("A State plan

58

for medical assistance must . . . provide . . . ."); 42 C.F.R. § 40.240(b) ("The plan

must provide that . . . .").

Accordingly, we reject the suggestion that a state's definition of the

purpose behind its medical services may, in and of itself, resolve a plaintiff's

challenge under the comparability provision. Rather, any genuine enforcement

of the Medicaid Act's comparability requirements must entail some independent

judicial assessment of whether a state has made its services available to all

categorically needy individuals with equivalent medical needs. See White, 555

F.2d at 1150 (assessing validity of state's judgment of comparative medical need).

Where a state purports to have made a medical determination that a particular

service is not a necessary or appropriate treatment for a particular condition, our

review of that judgment would presumably be highly deferential.[18] Even then,

however, our deference may be limited by the requirement that a state's

determination bear some genuine relation to beneficiaries' medical needs. See

---

[18] If, for example, New York had decided to eliminate coverage of orthopedic footwear and compression stockings for such conditions as hammertoes and bunions, for which the Commissioner contends that such treatments are wasteful and medically unnecessary, we would be presented with quite a different case. The Commissioner, however, makes no such argument about the conditions suffered by plaintiffs and the class they represent, and indeed concedes that the items in question are medically necessary to treat those conditions.

Pashby v. Delia, 709 F.3d 307, 341 (4th Cir. 2013) (holding that comparability provision allows states to "provide[ ] different coverage to different categorically needy individuals . . . so long as th[at] coverage . . . bears a reasonable relation to the particular needs of the individual") (internal quotation marks omitted); White, 555 F.2d at 1150-51 (holding that "state's broad discretion to define the medical conditions for which treatment is 'necessary'" is limited by nexus to medical need).

The record in this case exemplifies how easily a state can amend its definitions of its medical services without any regard to beneficiaries' medical needs – and the propriety of some judicial oversight over those definitions. The Commissioner does not purport to have determined that orthopedic footwear or compression stockings are medically necessary to treat only the medical conditions to which he has restricted them, nor that individuals with those medical conditions have a more urgent medical need for those services. Indeed, the Commissioner concedes that such products may be equally necessary for plaintiffs as they are for covered beneficiaries. Rather, he explains that, as a cost-saving measure, New York has elected to provide those products only to the *most common* conditions for which they are medically necessary – thus denying

60

coverage of those services not only to some individuals who do not genuinely need them, but also to some, such as plaintiffs, who do. The state then simply amended the governing regulations to define the purpose of the treatments as coextensive with the coverage it had decided, for non-medical reasons, to provide. Such an *ipse dixit* cannot suffice to avoid the mandate of the comparability requirement.

New York's coverage restrictions thus violate the plain text of § 1396a(a)(10)(B)(i) and § 440.240(b), denying categorically needy individuals comparable access to equally necessary medical services. The district court properly entered summary judgment in favor of plaintiffs on their claim under the comparability provision.

## V.    Anti-Disability Discrimination under the ADA and Rehabilitation Act

Fifth, plaintiffs claim that New York's restrictions on orthopedic footwear and compression stockings violate Title II of the ADA and § 504 of the Rehabilitation Act by excluding disabled individuals from public medical services on the basis of their disabilities, and violate the integration mandate of

61

those statutes by placing plaintiffs at a substantial risk of requiring

institutionalized care.[19]

Both Title II of the ADA and § 504 of the Rehabilitation Act protect the

rights of disabled individuals to participate in state-administered or funded

services.  Title II provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected

to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, § 504

provides that "[n]o otherwise qualified individual with a disability . . . shall,

solely by reason of her or his disability, be excluded from the participation in, be

denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

Because the standards imposed by Title II on public entities are generally

equivalent to those of § 504, we "treat claims under the two statutes identically"

in most cases.  Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).  To

---

[19] Although our resolution of plaintiffs' comparability provision claim suffices to entitle the categorically needy plaintiffs to relief, we proceed to address plaintiffs' ADA and Rehabilitation claims because those challenges hold the possibility of a scope of relief encompassing at least some of the medically needy.

state a prima facie claim under either provision, a plaintiff must establish

"(1) that she is a qualified individual with a disability; (2) that she was excluded

from participation in a public entity's services, programs or activities or was

otherwise discriminated against by a public entity; and (3) that such exclusion or

discrimination was due to her disability." Fulton v. Goord, 591 F.3d 37, 43 (2d

Cir. 2009) (internal quotation marks and alterations omitted).[20]  A plaintiff may

base her discrimination claim on one of three theories of liability: disparate

treatment, disparate impact, or failure to make a reasonable accommodation.  Id.

The Commissioner does not dispute that at least some plaintiffs qualify as

disabled individuals for the purposes of Title II and § 504.  Nor does he dispute

that New York's coverage restrictions on orthopedic footwear and compression

stockings exclude those plaintiffs from access to public medical services on the

basis of their medical conditions, effectively subjecting plaintiffs to disparate

treatment within New York's Medicaid program.[21]  Accordingly, the sole

---

[20] A plaintiff bringing a Rehabilitation Act claim must also establish that the defendant receives federal funding.  Henrietta D., 331 F.3d at 272.

[21] Although plaintiffs' amended complaint alleges that New York's restrictions both discriminate on the basis of disability and fail to provide reasonable accommodations, see Joint App'x at 404-05, their appellate brief suggests that the latter ground is subsidiary to their primary argument, see Appellees' Br. at

63

question before us on appeal is whether New York's denial of necessary medical

services to some disabled individuals on the basis of their medical conditions

constitutes discrimination due to disability so as to violate the ADA and

Rehabilitation Act.

The Commissioner insists that NYSDH's restrictions do not violate either

Title II or § 504 because they do not discriminate *against* the disabled, but simply

allocate limited state resources *among* disabled individuals. According to the

Commissioner, the ADA and Rehabilitation Act prohibit discrimination against

the disabled as compared to the able-bodied, but do not bar public entities from

drawing distinctions among groups of the disabled themselves.[22] Courts,

including this one, have held that the ADA does not bar unequal treatment of

---

58 n.18. We thus construe their brief as primarily pressing a disparate treatment claim.

[22] The Commissioner also suggests that plaintiffs cannot prevail on their Title II claim because they have provided no evidence that New York's coverage restrictions were motivated by animus against disabled individuals. While claims for damages under Title II require proof of discriminatory animus, claims for injunctive relief demand no such showing. See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 115 (2d Cir. 2001) ("[O]ur holding that private damage claims under Title II require proof of discriminatory animus or ill will based on disability does not affect . . . actions by private individuals for injunctive relief . . . ."). Because plaintiffs seek injunctive rather than monetary relief, they need not establish discriminatory animus to succeed on their claim.

different disabilities, so long as disabled individuals are not denied services provided to the able-bodied on the basis of their disabilities. See, e.g., Traynor v. Turnage, 485 U.S. 535, 549 (1988); Modderno v. King, 82 F.3d 1059, 1062 (D.C. Cir. 1996); Flight v. Gloeckler, 68 F.3d 61, 63-64 (2d Cir. 1995); P.C. v. McLaughlin, 913 F.2d 1033, 1041 (2d Cir. 1990).

Plaintiffs argue that a majority of the Supreme Court endorsed a broader view of discrimination under the ADA in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999). We agree that it did, at least with respect to a program requiring persons with mental disabilities to receive care in an institutionalized setting, while allowing those with physical disabilities to receive similar services in a community setting.

More specifically, Olmstead unquestionably holds that the "unjustified institutional isolation of persons with disabilities" is, in an of itself, a prohibited "form of discrimination." 527 U.S. at 600; see also id. at 607 (Stevens, J, concurring in part and concurring in the judgment) ("Unjustified disparate treatment, in this case, 'unjustified institutional isolation,' constitutes discrimination under the Americans with Disabilities Act of 1990."); id. at 613-14 (Kennedy, J, concurring in judgment) ("I deem it relevant and instructive that

65

Congress in express terms identified the 'isolat[ion] and segregat[ion]' of disabled persons by society as a 'for[m] of discrimination' and noted that discrimination against the disabled 'persists in such critical areas as . . . institutionalization.'" (alterations in original) (citations omitted)).

Justice Ginsburg, writing in Olmstead, reached that conclusion over the state's objection that "discrimination necessarily requires uneven treatment of similarly situated individuals," and that the plaintiffs had not identified a "comparison class" of similarly-situated non-disabled individuals "given preferential treatment," id. at 598 (internal quotation marks omitted); cf. Henrietta D., 331 F.3d at 277 (holding, in context of reasonable accommodations claim, that evidence "that a disability makes it difficult for a plaintiff to access benefits . . . is sufficient to sustain a claim," regardless of comparative treatment of others).[23]  Indeed, in Amundson ex rel. Amundson v. Wisconsin Dep't of

---

[23] In a prior case, this Court has suggested that the relevant portions of Justice Ginsburg's opinion in Olmstead reflect the views of only a plurality.  See Henrietta D., 331 F.3d at 276.  The Olmstead opinion itself characterizes the portions of Justice Ginsburg's opinion discussing the scope of "discrimination" under the ADA as representing the opinion of the Court.  See Olmstead, 527 U.S. at 587 (noting that Justice Ginsburg delivered the opinion of the Court with respect to Part III-A).  Whether everything in Part III-A in fact carries the endorsement of a majority of the Justices depends on whether one reads Justice Stevens's concurring opinion as turning solely on his view that "'unjustified

<u>Health Services</u>, 721 F.3d 871 (7th Cir. 2013), the Seventh Circuit observed that

"'discrimination' as used in § 12132 includes . . . undue institutionalization of

disabled persons, *no matter how anyone else is treated*." <u>Id</u>. at 874 (emphasis in

original).

In this case, New York's plan amendments restrict coverage of orthopedic

footwear and compression stockings for disabled persons to a narrow set of

medical conditions.  Any disabled persons who do not happen to suffer from

those enumerated ailments are thus denied access to medically necessary

assistance directly on the grounds of their disabling conditions.  It is undisputed

that at least some of the plaintiffs suffer from disabilities, which could be

ameliorated by the services New York now denies to them, and that, without

those services, would lead to their institutionalization.  By subjecting those

---

institutional isolation' constitutes discrimination under the Americans with
Disabilities Act of 1990." <u>See id</u>. at 607 (Stevens, <u>J</u>., concurring in part and
concurring in the judgment).  Indeed, Justice Stevens pinpointed the specific part
of Justice Ginsburg's opinion, <u>id</u>., citing <u>id</u>. at 600-01, which rested largely on the
effect of such unjustified isolation and the fact that, unlike § 504 of the
Rehabilitation Act, the ADA contains an "express recognition [of the fact] that
isolation or segregation of persons with disabilities is a form of discrimination,"
<u>id</u>. at 600 n.11 (majority opinion).  For the reasons set forth below, we need not
delve further into this question and we leave for another day the issue of whether
the ADA bans all forms of intra-class discrimination.

67

plaintiffs to an increased risk of institutionalization, New York's coverage

restrictions "exclude[ ] [disabled persons] from participation in a public entity's

services . . . due to [their] disability." Fulton, 591 F.3d at 43 (internal quotation

marks omitted); 42 U.S.C. § 12132 (prohibiting discrimination against disabled

individuals "by reason of [their] disability"); 29 U.S.C. § 794(a) (prohibiting

discrimination against disabled individuals "solely by reason of [their]

disability").

As the Supreme Court held in Olmstead, this conclusion follows in

substantial part from the "integration mandate," which is consistent with the

"concept of discrimination advanced in the ADA." 527 U.S. at 598; see 42 U.S.C.

§ 12101(a)(2) ("[H]istorically, society has tended to isolate and segregate

individuals with disabilities, and, despite some improvements, such forms of

discrimination against individuals with disabilities continue to be a serious and

pervasive social problem."); § 12101(a)(5) ("[I]ndividuals with disabilities

continually encounter various forms of discrimination, including . . . segregation

. . . "). Promulgated by the Department of Justice ("DOJ") pursuant to its

enforcement powers under Title II of the ADA, the integration mandate provides

that a public entity must "administer services, programs, and activities in the

most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The "most integrated setting appropriate" is the "setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." Olmstead, 527 U.S. at 592 (internal quotation marks omitted).[24]

In Olmstead, the Supreme Court interpreted the integration mandate to mean that the "unjustified isolation" of disabled individuals in institutionalized care facilities constitutes discrimination on the basis of disability under the ADA. 527 U.S. at 597. As the Court observed, the "unjustified institutional isolation" of disabled persons both "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and "severely diminishes [their] everyday life activities." Id. at 600-01. To avoid such damaging repercussions, the integration mandate thus requires a state to provide community-based treatment for disabled persons when (1) "the State's treatment

---

[24] Although the integration mandate appears only in DOJ's implementing regulations for the ADA, see 28 C.F.R. § 35.130 (drawing authority from 42 U.S.C. § 12134), we have recognized that its theory of liability also supports a discrimination claim under the Rehabilitation Act. See Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc., 675 F.3d 149, 152 (2d Cir. 2012); see also Frederick L. v. Dep't of Pub. Welfare, 364 F.3d 487, 490 & n.2 (3d Cir. 2004).

69

professionals determine that such placement is appropriate," (2) "the affected persons do not oppose such treatment," and (3) "the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [similar] disabilities." Id. at 607.

Following the Supreme Court's decision, DOJ announced its view that the disability discrimination claim recognized in Olmstead is not limited to individuals already subject to unjustified isolation, but also "extend[s] to persons at serious risk of institutionalization or segregation." U.S. Dep't of Justice, Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C., Q.6 (last updated June 22, 2011), [hereinafter "DOJ Statement"], available at www.ada. gov/olmstead/q&a _olmstead.htm. As the Department explained, a plaintiff "need not wait until the harm of institutionalization or segregation occurs or is imminent" in order to bring a claim under the ADA. Id. Rather, a plaintiff establishes a "sufficient risk of institutionalization to make out an Olmstead violation if a public entity's failure to provide community services . . . will *likely* cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." Id. (emphasis added).

70

Because the integration mandate "is a creature of the [DOJ's] own regulations," DOJ's interpretation of that provision is "controlling unless plainly erroneous or inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461 (1997) (internal quotation marks omitted).[25]

Unsurprisingly, against this backdrop, courts of appeals applying the disability discrimination claim recognized in Olmstead have consistently held that the risk of institutionalization can support a valid claim under the integration mandate. See Pashby, 709 F.3d at 322 (4th Cir. 2013) (holding that plaintiffs may raise successful ADA and Rehabilitation Act claims "because they face a risk of institutionalization"); M.R. v. Dreyfus, 697 F.3d 706, 720 (9th Cir. 2012) (recognizing violation where plaintiffs established that "reduced access to personal care services will place them at serious risk of institutionalization"); Radaszewski ex rel. Radaszewski v. Maram, 383 F.3d 599, 608 (7th Cir. 2004) (recognizing violation where state's actions "portend[ ] . . . unjustified

---

[25] The other *amicus* brief filed on behalf of the United States in this case, submitted by DOJ and addressing plaintiffs' ADA and Rehabilitation Act claims, similarly embraces this position. *See* U.S. Department of Justice *Amicus* Br.

71

institutional isolation" (internal quotation marks omitted));[26] <u>Fisher v. Okla. Health Care Auth.</u>, 335 F.3d 1175, 1181-82 (10th Cir. 2003) (holding that <u>Olmstead</u> does not require a disabled person to submit to institutionalization when "imperiled with segregation" due to a state policy).  As the Tenth Circuit has observed, "nothing in the plain language of the [integration mandate]" nor "in the <u>Olmstead</u> decision supports a conclusion that institutionalization is a prerequisite to enforcement."  <u>Fisher</u>, 335 F.3d at 1181.  To the contrary, the ADA's protections "would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy," <u>id</u>. – not least, since "[i]nstitutionalization sometimes proves irreversible," <u>Dreyfus</u>, 697 F.3d at 735.

---

[26] Contrary to the Commissioner's assertion, the Seventh Circuit's opinion in <u>Amundson ex rel. Amundson v. Wisconsin Department of Health Services</u>., 721 F.3d 871 (7th Cir. 2013), does not hold otherwise.  In <u>Amundson</u>, plaintiffs claimed that Wisconsin's reduction in group care reimbursements violated the integration mandate by forcing them out of their preferred group homes, but they produced no evidence that the new rate was insufficient for admission into other integrated facilities.  <u>Id</u>. at 873-74.  Absent any showing that plaintiffs had *either* "been placed in an institution" *or* were unable to "find another group home willing to accept the level of reimbursement," the Seventh Circuit dismissed their claim as unripe.  <u>Id</u>. at 874.  As <u>Radaszewski</u> demonstrates, however, the Seventh Circuit has acknowledged that a genuine risk of institutionalization may support a claim under the integration mandate.  <u>See</u> 383 F.3d at 608.

We find DOJ's and our sister circuits' interpretation of Olmstead both consistent with the integration mandate and well-reasoned, and we adopt it as our own. We thus hold that a plaintiff may state a valid claim for disability discrimination by demonstrating that the defendant's actions pose a serious risk of institutionalization for disabled persons. In this case, plaintiffs attest – and the Commissioner does not dispute – that New York's restrictions on medically necessary orthopedic footwear and compression stockings will severely exacerbate their ailments, putting them at a substantial risk of requiring institutionalized care. That showing establishes an injury sufficient to carry plaintiffs' integration mandate claim.

Because the "State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless," a state may be able to "resist modifications that entail a 'fundamenta[l] alter[ation]' of the States' services and programs." Olmstead, 527 U.S. at 603, quoting 28 CFR § 35.130(b)(7), (alteration in original); see Fisher, 335 F.3d at 1182-83. We need not decide whether a state can claim a fundamental alteration as a defense to an integration mandate claim, as opposed to a reasonable modifications claim, because the Commissioner here does not does not suggest that covering

73

compression stockings and orthopedic shoes would cause a fundamental alteration to the State's program.

The Commissioner does insist, however, that even assuming that a substantial risk of institutionalization may violate the integration mandate, the plaintiffs cannot prevail on their claim in this case, which involves purely optional services under New York's Medicaid program. Since New York could permissibly eliminate coverage of *all* orthopedic footwear and compression stockings, and thus leave plaintiffs with the same risk of institutionalization, without violating either the Medicaid Act or the ADA, the Commissioner argues that New York's decision to provide those benefits to only select recipients cannot be seen to "create" any such risk.

New York's conceded discretion to decide whether to provide coverage of orthopedic footwear and compression stockings under the Medicaid Act, however, does not affect its duty to provide those services in a non-discriminatory manner under the ADA. A state's duties under the ADA are wholly distinct from its obligations under the Medicaid Act. The Medicaid Act aims to provide comprehensive but resource-conscious medical care to needy individuals, a goal that it effects by mandating different levels of assistance for

74

different populations.  See generally 42 U.S.C. § 1396a.  By contrast, the ADA

reflects a "national mandate for the elimination of discrimination against

individuals with disabilities."  Id. § 12101(b)(1).  Accordingly, although the ADA

cannot and does not "require[ ] States to provide a certain level of benefits to

individuals with disabilities," it can and does require states to "adhere to the

ADA's nondiscrimination requirement with regard to the services they in fact

provide."  Olmstead, 527 U.S. at 603 n.14 (internal quotation marks omitted).  As

we noted in Rodriguez, "it is not our role to determine what Medicaid benefits

New York must provide," but rather to "determine whether New York

discriminates on the basis of a . . . disability with regard to the benefits it does

provide."  197 F.3d at 619.

So long as New York continues to provide coverage of orthopedic footwear

and compression stockings under its Medicaid plan, it cannot deny such services

only to certain disabled beneficiaries, with the effect of placing those disabled

persons at substantial risk of institutionalization, because such a denial subjects

plaintiffs to unjustified isolation on the basis of their disabilities in violation of

the integration mandate.  Since the Commissioner does not dispute the validity of

75

plaintiffs' claim with regard to the remaining <u>Olmstead</u> factors, plaintiffs are entitled to summary judgment on their integration mandate claim.

VI.    <u>Remedies</u>

Finally, we come to the question of remedy.  In the proceedings below, the district court certified plaintiffs' class action on behalf of all "current and future New York State Medicaid recipients for whom Defendant has directly or indirectly failed to provide coverage for medically necessary orthopedic footwear and compression stockings as a result of [the 2011 restrictions]."  Joint App'x at 415.  The court subsequently entered a permanent injunction prohibiting NYSDH and its agents from enforcing those coverage restrictions against any beneficiaries under New York's Medicaid plan.

The breadth of that remedy depended largely on the district court's ruling in favor of plaintiffs on their reasonable standards claim – a ruling that would have precluded NYSDH from enforcing its coverage restrictions against any and all beneficiaries.  With that claim now resolved in favor of the Commissioner, however, plaintiffs' remaining successful claims do not compel such sweeping relief.  Without exception, the provisions on which plaintiffs have prevailed entail remedies that are either more modest or benefit smaller subsets of the

76

plaintiff class. Plaintiffs' success under the comparability provision precludes New York from restricting coverage of orthopedic footwear and compression stockings only as to the categorically needy, not the medically needy. Plaintiffs' success on their ADA and Rehabilitation Act claims precludes New York from denying coverage only to beneficiaries with medical conditions that qualify as "disabilities" within the meaning of those statutes and are at risk of institutionalization. And plaintiffs' successful due process provision claim simply obliges New York to provide written notice to affected beneficiaries prior to implementing its new restrictions, rather than prohibiting New York from implementing those restrictions altogether.

Accordingly, while we affirm the district court's grants of summary judgment to plaintiffs on their claims under the comparability provision, the due process provision, and the anti-discrimination provision of the ADA and Rehabilitation Act, we must remand the case to allow the district court to craft a remedy more appropriately tailored to those claims. See Patsy's Italian Rest., Inc. v. Banas, 658 F.3d 254, 272 (2d Cir. 2011) ("[I]njunctive relief should be narrowly tailored to fit specific legal violations." (internal quotation marks omitted)). In so

doing, the court should reconsider both the proper breadth of the class certification and appropriate scope of injunctive relief.

## CONCLUSION

For the foregoing reasons, the district court's judgment is VACATED as to plaintiffs' claims under the Medicaid Act's reasonable standards provision and AFFIRMED as to plaintiffs' claims under the home health services, due process, the comparability provisions of the Act, and under Title II of the ADA and § 504 of the Rehabilitation Act. The injunction issued by the district court is VACATED and the case is REMANDED to the district court for reconsideration of appropriate relief.